**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Luis Acosta, an individual, | No. CV-05-1810-PHX-NVW |
| Plaintiff, | **ORDER** |
| vs. | |
| City of Phoenix, a municipal corporation, | |
| Defendant. | |

Pending before the court is Defendant's Motion for Summary Judgment (Doc. # 34).

**I.  Background**

This case is the latest in a long and diverse line of actions brought by Plaintiff Luis Acosta ("Acosta") against Defendant City of Phoenix ("City"). In December 1994, Acosta, a Mexican American, began employment as a "trades helper" at the Skunk Creek Landfill, a facility maintained by the City's Department of Public Works. Acosta's job required him to handle plumbing repairs at the landfill and assist carpenters, mechanics, and other skilled trades workers in the performance of their duties.

Between May and July 2001, Acosta submitted to the United States Environmental Protection Agency and the Arizona Department of Environmental Quality several notices of alleged City violations of federal environmental laws. Acosta sought the support of his co-workers in filing these actions.

1    For a variety of reasons, Acosta's behavior created an atmosphere of hostility between
2    himself and other landfill employees. On July 12, 2001, sixteen of Acosta's co-workers
3    submitted a signed statement to the Department of Public Works calling for disciplinary
4    action against him. The statement read:

> We, employees of the City of Phoenix Skunk Creek Landfill, feel that Luis Acosta is creating a non-conducive work environment. His behavior toward his fellow co-workers is not only making us feel like we are walking on eggshells, but is also making us feel we have to continually look over our shoulders due to his constant distractions and accusations. We find this demeaning toward all the employees at the landfill.
>
> His attitude toward his fellow co-workers does not demonstrate a team environment or a healthy work atmosphere. Not only is this annoying, it has created morale, production and work ethic problems.
>
> We are respectfully requesting that the City of Phoenix take appropriate action toward Mr. Acosta's behavior to correct the hostile environment he has created at the landfill.

Doc. # 35, Exhibit 1. On July 25, 2001, four additional co-workers signed a joint statement which read:

> We the undersigned have requested the Foremen at Skunk Creek Landfill not to assign us to work with Mr. Luis Acosta for the following reasons:
> 1.   Mr. Acosta treats us with lack of mutual respect when we are assigned to work with him.
> 2.   Mr. Acosta has requested personal information from us on numerous occasions for a purpose unknown to us.
> 3.   Mr. Acosta continues to tell us to participate in actions with the landfill and management in which we do not agree with or wish to partake in. Despite our requests for him to stop he continues to tell us to participate in these actions.

Doc. # 35, Exhibit 1. All of the employees who signed these statements were male; several were also Hispanic.

Problems persisted after the submission of these complaints. On July 26, 2001, Acosta filed notice of an alleged safety hazard with the Industrial Commission of Arizona's Division of Occupational Safety & Health. The notice alleged that safety rails on a machine used for trash extraction at Skunk Creek were missing, causing the machine to be unsafe. Acosta requested that his identity as the filer of the notice not be revealed to the City because

- 2 -

1  he "want[ed] protection," and because "disparate treatment already exist[ed] in [his] work
2  place."  Doc. # 40, Exhibit 3.
3       In August 2001, Acosta was transferred to the Salt River Service Center and informed
4  that he was being investigated for creating a hostile work environment at Skunk Creek.
5  Acosta performed tasks at Salt River not typically assigned to trades helpers and considered
6  his new position a demotion.  City Public Works Director Mark Leonard, who was involved
7  in the decision to transfer Acosta, explains that the action was taken because of "safety
8  concerns" and a "petition/complaint . . . received from numerous co-workers of Mr. Acosta."
9  Doc. # 35, Exhibit 3 at 2.  No City employee ever stated that Acosta was transferred to Salt
10 River because of the claims he had filed against the City or because he is Hispanic.
11      Upon completion of its investigation, the City filed a disciplinary notice on October
12 5 that suspended Acosta from his employment for October 8-9, 2001.  The notice articulated
13 several justifications for the suspension.  First, it explained that Acosta had violated City
14 personnel rules against insubordination and the "incompetent or inefficient" performance of
15 job duties by failing to repair broken toilets at Skunk Creek facilities.  Doc. # 40, Exhibit 4.
16 The notice also stated that Acosta had committed a "gross violation of established
17 procedures" by neglecting to notify management of hazardous materials suspected of being
18 dumped at the landfill.  *Id.*  The notice further stated that Acosta had shown "continuing
19 negative behavior" by raising unfounded complaints of safety violations against the City and
20 "creating a hostile work environment" for his co-workers.  *Id.*  In support of the latter
21 conclusion, the notice cited the memorandum filed with Skunk Creek's management by
22 Acosta's co-workers on July 25, 2001.  It was found that Acosta's behavior violated a City
23 personnel rule against "abusive or threatening" conduct toward fellow employees.  *Id.*
24 Acosta signed the statement describing these violations, but below his signature added, "I
25 don't agree with above statement and sign under protest."  *Id.*
26      The City's Civil Service Board upheld the disciplinary action on February 25, 2002.
27 The Board found that Acosta had been "suspended for several incidents of inappropriate and
28 disruptive conduct contributing to creating a hostile work environment for some of his

1  coworkers; negligence in carrying out his job duties; reporting false safety and hazardous
2  dumping violations without first notifying his supervisor; and inappropriately soliciting
3  coworkers and contractors to take action to discredit the City." Doc. # 40, Exhibit 5.

4        In April 2002, Acosta filed a grievance with the City's Equal Opportunity
5  Department, complaining that his transfer to the Salt River Service Center manifested
6  discrimination on the basis of national origin. The Department's investigative summary
7  found otherwise, explaining that, based on the preliminary information and documentation
8  it had received, "there [was] no identifiable basis for conducting an investigation into
9  Acosta's allegation." Doc. # 35, Exhibit 2. The summary concluded as follows:

> A preliminary review of the evidence supports a reasonable inference that Mr. Acosta's relocation was due to his coworker's [sic] complaints. The nineteen [sic] coworkers whose signatures are found on the grievance against Acosta represent a diverse group in several protected categories. In fact, three of the coworkers who lodged a complaint against Acosta are members of the same protected groups. . . . There is no evidence to suggest that Acosta's gender (male), age (42), or national origin (Hispanic) are related to his transfer.

15  Doc. # 35, Exhibit 2.

16        Acosta was suspended a second time on January 2, 2003. The basis for this action
17  was that Acosta had violated a directive of the Public Works Director by attending a City
18  Council meeting to voice discontent with his transfer and prior suspension. The Civil Service
19  Board rescinded the second suspension after finding it unwarranted. Doc. # 40, Exhibit 6.

20        In July 2004, Acosta appeared at a City Council meeting to complain that the
21  Department of Public Works had misused funds by failing to recover an unspecified form of
22  "warranty money" in the "best interest of the taxpayers." Doc. # 35, Exhibit 6 at 21. From
23  the submissions of the parties, it is unclear how the City Council responded to the allegation.

24        Also in July 2004, a building maintenance worker at the Metro Facilities Division of
25  the City's Public Works Department took an extended leave of absence due to disability.
26  The City assigned Acosta to fill the worker's position in early August, which put Acosta in
27  charge of changing filters on air conditioners in all City-owned buildings. The letter of
28  assignment stated that the job would likely last six to twelve months, and that Acosta's

1   "salary and benefits [would] not be affected as a result of [the] transfer." Doc. # 40, Exhibit
2   7. Acosta retained his title of trades helper in carrying out the new assignment. Public
3   Works Director Mark Leonard chose Acosta to fill the vacancy because Acosta had
4   previously expressed an interest in working closer with skilled tradespeople, and the job
5   would allow him to gain that experience. Doc. # 35, Exhibit 3 at 2-3. Acosta accepted the
6   assignment because he felt it "would be a great opportunity to learn new skills, meet new
7   individuals and assist [the] department in an area of need." Doc. # 40, Exhibit 8 at 2. No
8   City employee ever told Acosta that he was transferred to the Metro Facilities Division
9   because of the various claims he had filed against the City or because he is Hispanic. Doc.
10  # 35, Exhibit 6 at 25.

11         Acosta began working at the Metro Facilities Division on August 2, 2004. At the
12  time, space in the Division's building was partly apportioned to administrative offices; partly
13  apportioned to a heating, ventilation, and air-conditioning shop; and partly apportioned to a
14  building maintenance shop. The building also contained a warehouse. Some parts of the
15  building were air conditioned, while others relied on swamp coolers for temperature control.
16  Facilities Maintenance Superintendent Loren Pike assigned Acosta to a desk located in the
17  warehouse, a portion of the building that used a swamp cooler and contained the air filters
18  Acosta would need to complete his job. Other employees were also assigned to the
19  warehouse area, although none of them were employed in Acosta's line of work.

20         Pike explained that he assigned Acosta to the warehouse because Acosta's position
21  required him "to be out in the field almost 100% of the time," and he "only needed a 'work
22  station' as a place to report in the mornings and a place to complete paperwork that would
23  be necessary at the close of the day." Doc. # 35, Exhibit 4 at 2. He also explained that the
24  assignment was motivated by the practical advantage of locating Acosta in close proximity
25  to his supplies. Pike had no prior contact with Acosta, but was aware of co-worker
26  complaints in connection with Acosta's prior work at Skunk Creek. No City employee ever
27  stated that Acosta was assigned to the warehouse because of his ethnicity or because he had
28  previously filed claims against the City.

1  On August 4, shortly before starting time, Pike noticed that Acosta was not sitting at 2 his assigned location, so he repeated the instruction that Acosta was to report to his assigned 3 desk in the warehouse. Acosta believes that, after this encounter, Pike "began . . . placing 4 judgment" upon him without allowing any time "to get to know [him] as an employee or 5 individual." Doc. # 40, Exhibit 11. Several weeks later, Acosta advised his supervisor that 6 he felt "ostracized and segregated against" because of the location of his desk and that he 7 would contact Mark Leonard to discuss the issue that night. *Id.* In response to Acosta's 8 complaint, the Division moved Acosta out of the warehouse and into an air-conditioned 9 cubicle located in close proximity to front-office personnel. Acosta then complained that the 10 new location segregated him from employees engaged in his line of work.

11  Acosta then filed two grievances against the City in connection with his work at the 12 Metro Facilities Division. In the first, filed with the Public Works Department on November 13 29, 2004, he alleged that because building maintenance workers are paid at higher rates than 14 are trades helpers, the City was underpaying him by retaining his previous pay while tasking 15 him with the responsibilities of a building maintenance worker. He requested a pay increase 16 to match his new responsibilities. Doc. # 40, Exhibit 8. The Public Works Department 17 initially denied Acosta's request on December 6, 2004, on the ground that his job did not 18 include the "higher-level duties of a Building Maintenance Worker." Doc. # 40, Exhibit 9. 19 However, the grievance was subsequently upheld, and the requested compensation was 20 granted in full on December 15, 2004. Doc. # 40, Exhibit 10.

21  Acosta filed a second grievance in connection with his job at Metro Facilities Division 22 on February 3, 2005. The basis for this action was that Pike had required him to work in the 23 warehouse, an area that was allegedly isolated and that used a swamp cooler rather than an 24 air conditioner. Observing that other personnel worked in close proximity to others and in 25 air-conditioned environments, Acosta stated that he felt "segregated, intimidated as well as 26 stressed about being ostracized." Doc. # 40, Exhibit 11. As a remedy, he requested to be 27 located with the "building maintenance employee group." *Id.*

28

Acosta's second grievance was denied by the City's Public Works Department as untimely because it concerned events that occurred in August 2004. Doc. # 40, Exhibit 12. The grievance was also denied because Acosta had already been moved out of the warehouse and into an air-conditioned cubicle alongside the Metro Facilities Division's office staff. Acosta expressed dissatisfaction with the denial on the ground that the alleged violation was ongoing. *Id.*

On March 11, 2005, Acosta filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), claiming retaliation and discrimination on the basis of national origin. The basis for the charge was that he was being "supervised by a non-traditional supervisor who oversees . . . City planners only." Doc. # 35, Exhibit 7. Acosta further stated that he believed he was being retaliated against for "reporting a half million dollars of mishandled product not in the best interest of the public good," and that "because of my national origin (Mexican-American) [the City] is discriminating against me because of my intelligence in the work place." Doc. # 40, Exhibit 2. The charge indicated that the latest date of the cited discrimination was March 11, 2005, and that the discrimination was not ongoing. *Id.* The EEOC denied the charge because it could not conclude that a violation had occurred. A right-to-sue letter was issued on March 31, 2005.

Acosta now argues that the City has discriminated against him on the basis of national origin by "reassigning him to new work areas and keeping him apart and separate from his co-workers," in violation of 42 U.S.C. § 2000e-2(a)(2) (Count I). Doc. # 1 at 5. He contends that the same conduct also constitutes retaliation in violation of 42 U.S.C. § 2000e-3(a) (Count II). Defendant moves for summary judgment under Federal Rule of Civil Procedure 56.

**II.     Standard of Review**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

1  The party seeking summary judgment bears the initial burden of informing the court of the
2  basis for its motion and identifying those portions of the pleadings, depositions, answers to
3  interrogatories, and admissions on file, together with the affidavits, if any, which it believes
4  demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*,
5  477 U.S. 317, 323 (1986). Where the moving party has met its initial burden with a properly
6  supported motion, the party opposing the motion "may not rest upon the mere allegations or
7  denials of his pleading, but . . . must set forth specific facts showing that there is a genuine
8  issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1985).

9  The Court must evaluate a party's motion for summary judgment construing the
10 alleged facts with all reasonable inferences favoring the nonmoving party. *See Baldwin v.*
11 *Trailer Inns, Inc.*, 266 F.3d 1104, 1117 (9th Cir. 2001). The evidence presented by the
12 parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory and speculative testimony in
13 affidavits and moving papers is insufficient to raise genuine issues of fact and to defeat
14 summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.
15 1979).

**III.   Analysis**

    **A.   Timeliness of the EEOC Charge**

        **1.   42 U.S.C. § 2000e-5(e)(1)**

Generally, a plaintiff asserting claims under Title VII must file an administrative charge with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). However, where the plaintiff first "instituted proceedings with a State or local agency with authority to grant or seek relief," the Title VII claim must be filed with the EEOC "within three hundred days after the alleged unlawful employment practice occurred." *Id.* To trigger the application of the 300-day limitations period, the state or local agency with which the plaintiff's grievance was initially filed must satisfy the following qualifications:

> (1) That the State or political subdivision has a fair employment practice law which makes unlawful

- 8 -

> employment practices based upon race, color, religion, sex, national origin or disability; and
>
> (2) That the State or political subdivision has either established a State or local authority or authorized an existing State or local authority that is empowered with respect to employment practices found to be unlawful, to do one of three things: To grant relief from the practice; to seek relief from the practice; or to institute criminal proceedings with respect to the practice.

29 C.F.R. § 1601.70(a). An agency that satisfies these requirements may be formally designated a "Fair Employment Practices" ("FEP") agency if it "submits a written request to the Chairman of the [Equal Employment Opportunity] Commission." 29 C.F.R. § 1601.70(b). Alternatively, if the Commission is "aware that an agency or authority meets the . . . criteria for FEP agency designation [in § 1601.70(a)], the Commission shall defer charges to such agency or authority even though no request for FEP agency designation has been made." *Id.*

Defendant argues that Plaintiff's claims are time-barred under 42 U.S.C. § 2000e-5(e)(1). In the action filed with the EEOC on March 11, 2005, Acosta stated that the Metro Facilities Division forced him to work in an isolated warehouse that used a swamp cooler. This alleged segregation began on the first day of his employment with the Division: August 2, 2004. The time between August 2, 2004, and March 11, 2005, is 221 days. Thus, if the 300-day limitations period governs, Plaintiff's claims were timely filed with the EEOC. If the 180-day period governs, Plaintiff's claims were untimely in the absence of some other justifying circumstance.

Applying 42 U.S.C. § 2000e-5(e)(1), Acosta had only 180 days to file his charge with the EEOC. The 300-day limitations period only governs if a plaintiff first instituted an action with a "State or local agency with authority grant or seek relief." 42 U.S.C. § 2000e-5(e)(1). Plaintiff's employee grievance was filed with the City's Department of Public Works on February 3, 2005. While the Phoenix Department of Public Works may appear to fall under the statutory terms that trigger the 300-day period, the regulations that implement 42 U.S.C. § 2000e-5(e)(1) indicate otherwise. 29 C.F.R. § 1601.74(a) lists all

- 9 -

1 agencies that have received the "FEP agency" designation. The only such agency from the
2 state of Arizona is the Arizona Civil Rights Division. *Id.* Additionally, there is no record
3 evidence that the City's Department of Public Works actually petitioned the EEOC for FEP
4 designation, or that the EEOC was otherwise aware that the Department met the criteria for
5 that designation. As a result, 29 C.F.R. § 1601.70(b) precludes the Department of Public
6 Works from operating as a "state or local agency with authority to grant or seek relief" under
7 42 U.S.C. § 2000e-5(e)(1), and the 180-day period applies.

8     42 U.S.C. § 2000e-5(e)(1)'s 180-day limitations period has been held applicable in
9 closely analogous circumstances. In *Branco v. Massachusetts Department of Revenue*, 2000
10 U.S. Dist. LEXIS 16249 (D. Mass. Nov. 2, 2000), the plaintiff filed a complaint alleging
11 employment discrimination with the Massachusetts Civil Service Commission. Two hundred
12 and sixty days after the last act of alleged discrimination, the plaintiff grew impatient with
13 the lack of progress in his claim before the Civil Service Commission, so he filed a charge
14 with the EEOC. It was found, however, that the claims filed with the Civil Service
15 Commission did not toll the limitations period under 42 U.S.C. § 2000e-5(e)(1). While the
16 Commission appeared to satisfy the facial requirements of the statute, it was not listed as an
17 FEP agency in 29 C.F.R. § 1601.74(a), and there was no indication in the record that the
18 Commission had actually petitioned the EEOC for FEP designation or that the EEOC was
19 aware that the Commission met the criteria for FEP designation in 29 C.F.R. § 1601.70(a).
20 *Id.* at *6-7.

21     **2.**    **The Continuing Violation Doctrine**

22     Acosta attempts to salvage his claims by arguing that even if the 180-day limitations
23 period applies, his March 11 complaint of harassment was timely because it concerned an
24 "ongoing condition" that persisted within the 180-day period. He identifies this condition
25 as the "denial of the privilege to be able to work with co-employees who performed the same
26 or similar job duties." Doc. # 39 at 6.

27     The argument is unpersuasive. Discrete acts of discrimination that occur outside the
28 statutory time period may not be considered in evaluating a Title VII claim. *Nat'l R.R.*

- 10 -

1  *Passenger Corp. v. Morgan*, 536 U.S. 101, 113-14 (2002). An employer's rejection of a
2  proposed accommodation is not an ongoing condition, but rather a discrete act. *Cherosky v.*
3  *Henderson*, 330 F.3d 1243, 1247 (9th Cir. 2003). Even though the effect of the denial
4  "continues to be felt by the employee for as long as he remains employed," the denial is
5  deemed to occur exclusively on the date on which the employee's proposal is rejected. *Id.*
6  at 1248 (quoting *Elmenayer v. ABF Freight Sys., Inc.*, 318 F.3d 130, 134-35 (2nd Cir. 2003)).
7  The record indicates that Acosta requested to be located with building maintenance workers
8  during the week of August 31, 2004, and that his request was tacitly denied. Doc. # 40,
9  Exhibit 11. From this evidence, it is apparent that the proposed accommodation was rejected
10 at least 190 days before Acosta filed a charge before the EEOC.

11 For these reasons, and because there is no dispute of material fact concerning the dates
12 at issue, Acosta's claims are time-barred by 42 U.S.C. § 2000e-5(e)(1). Summary judgment
13 will be granted.

14 **B.  The Merits**

15 Even if Acosta hypothetically filed his charge of discrimination with the EEOC in a
16 timely fashion, his claims cannot survive the Motion for Summary Judgment. Lawsuits
17 arising under Title VII of the Civil Rights Act of 1964 are subject to a three-stage burden-
18 shifting analysis. *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093 (9th Cir.
19 2001). First, the plaintiff shoulders the burden of proving a prima facie case of
20 discrimination by a preponderance of the evidence. *McDonnell Douglas Corp. v. Green*, 411
21 U.S. 792, 802 (1973); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).
22 Once the plaintiff has created a presumption of unlawful discrimination, the burden of
23 production, but not persuasion, shifts to the defendant to articulate a legitimate, non-
24 discriminatory reason for its adverse employment action. *McDonnell Douglas*, 411 U.S. at
25 802. If the employer satisfies this burden, the plaintiff must then prove by a preponderance
26 of the evidence that the reasons advanced by the defendant constitute mere pretext for
27 unlawful discrimination. *Id.*

28

"As a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment." *Chuang v. Bd. of Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000). Nevertheless, the plaintiff must still raise a genuine issue of material fact that the defendant's legitimate, non-discriminatory reason for her termination was pretextual. *Snead*, 237 F.3d at 1094. The plaintiff may demonstrate pretext either directly, by persuading the court that a discriminatory reason more likely motivated the employer, or indirectly, by showing that the employer's proffered explanation is unworthy of credence. *Id.* at 1093-94.

### 1. Count I: Discrimination on the Basis of National Origin

Title VII makes it unlawful for an employer to "limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(2). To establish a prima facie case of disparate treatment under this statute, a plaintiff must show that "(1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004).

Defendant contends that Acosta has failed to demonstrate an adverse employment action. "An adverse employment action is a discriminatory act which 'adversely affects the terms, conditions, or benefits' of the plaintiff's employment." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004). "Conduct short of 'ultimate employment decisions' can" satisfy this standard. *Id.* However, the "mere fact that a new job assignment is less appealing to the employee . . . does not constitute adverse employment action." *Id.* at 376.

### a. The Transfer to the Salt River Service Center

In light of the cited authority, Plaintiff has made a prima facie case that his transfer to the Salt River Service Center was an adverse employment action. In connection with that transfer, Acosta was demoted from his status as a trades helper. Although he apparently continued to receive the same salary, the transfer adversely affected the "terms" and "conditions" of his employment. *James*, 368 F.3d at 375.

Nevertheless, Defendant has articulated legitimate, non-discriminatory reasons for this adverse employment action. Acosta's transfer to Salt River occurred after the City had received twenty written complaints from his co-workers. These complaints stated that Acosta's behavior toward other employees was "demeaning" and "created morale, production and work ethic problems." Doc. # 35, Exhibit 1. The statements also explained that Acosta caused "constant distractions" and made others feel "like [they were] walking on eggshells." *Id.* Several of the co-workers who signed these complaints were Hispanic males. *Id.* The City's Public Work Director explained that he transferred Acosta to Salt River because of these complaints. Doc. # 35, Exhibit 3 at 2.

Plaintiff has not even attempted to establish that the articulated reason for his transfer to Salt River was a mere pretext for discrimination. Count I therefore cannot survive the Motion for Summary Judgment on the basis of Acosta's transfer to the Salt River Service Center.

### b. The Transfer to the Metro Facilities Division

Plaintiff has failed to establish a prima facie case of discrimination in connection with his transfer to the Metro Facilities Division and subsequent isolation from building maintenance workers. These actions were not adverse employment actions. Acosta heartily accepted the transfer to the Division because he felt it "would be a great opportunity to learn new skills, meet new individuals and assist [the] department in an area of need." Doc. # 40, Exhibit 8 at 2. The transfer did not change Acosta's job title or affect his benefits. Doc. # 40, Exhibit 7. Acosta even received a higher salary at the Division than he had received from either of his prior positions with the City. Doc. # 40, Exhibit 10. When Acosta began to feel

- 13 -

isolated from co-workers at the Division and dissatisfied because his new workspace used a swamp cooler rather than centralized air conditioning, Division management responded by promptly moving him to an air-conditioned cubicle located in close proximity to other employees. Doc. # 40, Exhibit 11. Although Acosta remained dissatisfied even after receiving these accommodations, Title VII does not support an action simply because the employer provides employment conditions that are less than utopian.

Even if Acosta hypothetically demonstrated that his transfer to the Metro Facilities Division was an adverse employment action, Defendant has also articulated a legitimate, non-discriminatory reason for that action. The building maintenance worker who preceded Acosta at the Division took an extended leave of absence due to disability, and the Division needed someone to fill his position. The Public Works Director chose Acosta because Acosta had previously expressed an interest in working closer with tradespeople, and the job would allow him to gain that experience. Doc. # 35, Exhibit 3 at 2-3. It is apparent from the record that the transfer was simply an attempt to fulfill Acosta's expressed career interests, rather than a hostile act of discrimination.

Defendant has also articulated a legitimate, non-discriminatory justification for the location and condition of Acosta's workspace at the Division. The superintendent explained that he assigned Acosta to the warehouse because Acosta's position required him "to be out in the field almost 100% of the time," and Acosta "only needed a 'work station' as a place to report in the mornings and a place to complete paperwork that would be necessary at the close of the day." Doc. # 35, Exhibit 4 at 2. From these statements, it appears that Acosta was assigned to the warehouse for practical reasons rather than because of discrimination.

In an attempt to show pretext, Acosta baldly asserts that he was transferred because of his national origin. However, other than his subjective belief, there is zero support for that assertion. Count I thus cannot survive the Motion for Summary Judgment with respect to Plaintiff's transfer to the Metro Facilities Division.

### 2. Count II: Retaliation

Title VII's anti-retaliation provision forbids employer actions that "discriminate against" an employee because he has "opposed" a practice that Title VII forbids or has "made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). The framework set forth in *McDonnell Douglas*, as modified for retaliation cases, requires that the plaintiff "demonstrate that (1) []he had engaged in protected activity; (2) []he was thereafter subjected by [his] employer to an adverse employment action; and (3) a causal link existed between the protected activity and the adverse employment action." *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 894 (9th Cir. 2005) (citations omitted). On summary judgment, "the existence of a discriminatory motive for the employment decision will generally be the principal question." *Lam v. Univ. of Haw.*, 40 F.3d 1551, 1559 (9th Cir. 1994).

#### a. The Transfer to the Salt River Service Center

Acosta first argues that he was transferred to the Salt River Service Center in retaliation for filing safety and environmental complaints against the City in the summer of 2001. In support of this position, he points out that the transfer was made only a few weeks after the complaints were filed.

Plaintiff fails to make a prima facie case. A retaliation claim under Title VII must be based on an adverse employment action taken because the employee "opposed a practice made an unlawful employment practice by" Title VII, or because the employee "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a). Acosta's claims against the City in the summer of 2001, however, concerned violations of federal environmental laws and state safety regulations. Title VII does not make unlawful the conduct on which those claims were founded. Thus, even assuming that Acosta was transferred to Salt River in retaliation for the safety and environmental claims he filed against the City, Title VII provides no cause of action.

### b.     The Transfer to the Metro Facilities Division

Plaintiff also argues that he was transferred to the Metro Facilities Division in retaliation for the various complaints he filed against the City between 2001 and 2004. Insofar as the claim is based on complaints filed against the City for activities not governed by Title VII, Acosta has failed to make a prima facie case for the reasons articulated above. To the extent that the claim concerns retaliation for actions actually governed by Title VII, the claim fails because the transfer to the Division was not adverse. 42 U.S.C. § 2000e-3(a) "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2414 (2006). The plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which . . . means that it well might have dissuaded a reasonable worker from making or supporting" charges against the City. *Id.* at 2415 (internal quotations omitted). "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*

The record does not support Plaintiff's assertion that his second transfer was adverse. As explained above, Acosta had previously requested a job like the one he received at the Division, and he looked forward to carrying out the assignment. Moreover, the transfer did not result in any change in Acosta's title or benefits. He even received a higher salary at the Division than he had received at Skunk Creek or Salt River. The fact that Acosta's workplace used a swamp cooler rather than centralized air conditioning was, at best, no more than a "minor annoyance" that cannot support a claim under Title VII, particularly in light of the fact that Acosta was promptly moved to an air-conditioned cubicle after he complained. Although Acosta's original workspace isolated him from building maintenance workers, other employees were present in the warehouse, and Acosta worked nearby the Division's office personnel after he received a cubicle.

Fancifully assuming that Acosta has in fact made a prima facie case of retaliation under Title VII, the City has, as explained earlier, articulated legitimate, non-discriminatory

1 reasons for transferring Acosta to the Metro Facilities Division and locating him in its
2 warehouse, and Acosta has failed to establish that those reasons were pretextual.  He argues
3 that retaliation can be inferred from the fact that the City relocated him to a cubicle
4 approximately one month after he complained about conditions at the warehouse.  In some
5 situations, temporal proximity between a plaintiff's action and the employer's response may
6 support an inference of retaliation.  *Bell v. Clackamas County*, 341 F.3d 858, 855 (9th Cir.
7 2003).  However, the City relocated Acosta in order to accommodate him.  The fact that the
8 accommodation failed to satisfy Acosta's precise expectations does not demonstrate that the
9 accommodation was made in retaliation.

10     IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment
11 (Doc. # 34) is GRANTED.

12     IT IS FURTHER ORDERED that the clerk enter judgment in favor of Defendant and
13 that Plaintiff take nothing.  The clerk shall terminate this case.

14     DATED this 4th day of December 2006.

_____
Neil V. Wake
United States District Judge

- 17 -